**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | | |
|---|---|---|
| **CYNTHIA GOYNE** and **BRITTANY STUTZMAN** | | **PLAINTIFFS** |
| vs. | No. 4:21-cv-199-KGB | |
| **PROPEL TRUCKING, INC.** and **MARC CAMPBELL** | | **DEFENDANTS** |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Defendants, Propel Trucking, Inc. ("Propel") and Marc Campbell, hereby submit the following Findings of Fact and Conclusions of Law:

**Findings of Fact**

1. Plaintiff Cynthia Goyne filed her lawsuit on March 12, 2021.

2. Ms. Goyne claimed that she was a nonexempt employee and that she is due some unidentified amount of overtime. Defendants denied Ms. Goyne's contention.

3. Cynthia Goyne was employed by Propel as a fleet manager, safety manager, and Comdata administrator. These were her primary duties. Ms. Goyne also sent out approximately 40 invoices each week for the company. Billing was a secondary duty that should not have taken more than one day to complete.

4. As fleet manager, Ms. Goyne managed the logistics, the trucks, and the drivers. She also planned the trucks. Ms. Goyne was responsible for finding loads, deciding what load to take, negotiating the load, pricing the load, and negotiating the price. With respect to a trucking company such as Propel, the fleet is critical, logistics are critical, drivers are critical, and safety is critical. Ms. Goyne managed all of these aspects of the company. Ms. Goyne also canceled loads, which

impacted drivers and the company. Ms. Goyne further acknowledged that it was her job to "keep the wheels moving" and "make that truck money."

5.      As safety manager, Ms. Goyne was in charge of safety for Propel. Safety is extremely important in the trucking business. It is a "big deal." As safety manager, Ms. Goyne ensured drivers complied with safety requirements and acted if they did not, ensured equipment complied with safety requirements and acted if it did not, hired and/or recommended hiring drivers, and terminated and/or recommended terminating drivers. She investigated accidents and was the company's claims manager, handling and negotiating all damage claims. She also drafted contracts and signed contracts for the company. Her decisions were critical to whether the company made money or lost money, whether drivers made money or lost money, and whether the company performed in a safe manner as required by federal and state regulations. The owner relied on her discretion and judgment.

6.      Ms. Goyne interviewed prospective drivers. The purpose of the interviews was to qualify the drivers and also get to know their personality. Ms. Goyne conducted many interviews. Ms. Goyne made certain judgments based on her interviews. She would decide whether the driver was a good fit or a bad fit. Ms. Goyne had authority to hire or not hire drivers. She admittedly hired drivers. She also recommended directly to the owner, Marc Campbell, that he hire or not hire drivers she interviewed. Ms. Goyne admitted that Marc Campbell trusted her judgment when she made a recommendation.

7.      Ms. Goyne was also the administrator for the Comdata payment system. This is a line of credit used to advance funds to drivers. The fund circulates as much as $45,000 per week. A manager must determine who will receive Comdata checks, as well as the amount of said checks. As manager of the company's Comdata cash flow account (approximately $45,000 per week), Ms.

Goyne approved or disapproved driver funds, advanced driver funds, approved or disapproved driver expenses, and exercised complete control over the account.

8. After she resigned from Propel, Ms. Goyne sent out a resume that detailed her responsibilities for Propel: "A/R, A/P, Billing Collections, Driver Settlements, Auditing, Issue Cash Advances, Assist Accounting Supervisor with Daily Business, Issue POS for Parts and Repairs, Gather and Generate Information for Daily Business, Review and Write Contracts for Submittal to Supervisors for Daily Business, Recruit, Hire, Qualify and Retain Driver Personnel According to Company, Insurance and DOT, Setup, Maintain all Drug Testing Required by Company Policy and DOT, Lease Qualify and Maintain All Equipment Leased to Company, Permits, Obtain and Maintain all Licenses, Authority and Permits Required for Daily Operation, Plan and Dispatch Trucks, Make Appointments, Provide Customer and Driver Services, Problem Solve, Contact Meet and Setup New Customers, Track and Provide Customer Service, Submit Required Documents, Review Contracts Submit to Supervisor for Approval, Submit Rates to Customers for Services Provided, Accidents/Claims Investigate, Submit Required Paperwork, Direct Personnel, To Minimize Loss, Submit Claims." These representations were intended by Ms. Goyne to be read and relied on by future employers and accurately reflect her job responsibilities while employed by Propel.

9. Ms. Goyne signed contracts for the company.

10. Fleet manager was one of Ms. Goyne's primary duties. The position required the exercise of discretion and independent judgment on matters of significance.

11. Safety manager was one of Ms. Goyne's primary duties. The position required the exercise of discretion and independent judgment on matters of significance.

12. Comdata administrator was one of Ms. Goyne's primary duties. The position required the exercise of discretion and independent judgment on matters of significance.

13. Ms. Goyne also handled billing for the company. This required her to send out approximately 40 invoices per week. This was a secondary duty that did not require more than one day of work. Ms. Goyne acknowledged that the invoices had to be sent by Tuesday or Wednesday. Because the company is no longer associated with US Express, it is now sending out approximately 145 invoices per week. The invoicing is handled by Mona Campbell. It takes Ms. Campbell approximately one and one-half days to complete the current invoicing.

14. Ms. Goyne was paid a salary that satisfied the salary basis test for the administrative and executive exemptions. The salary was intended to cover all hours worked by Ms. Goyne. She received the same salary whether she worked 20 hours or 50 hours in a given week.

15. Propel properly classified Ms. Goyne as an exempt employee.

### *Cynthia Goyne – Findings of Fact as to Damages if Defendants Found Liable*

16. Propel required its employees to record their time on the company's timekeeping system. Ms. Goyne recorded her time through the company's timekeeping system unless she forgot to clock out, which happened on occasion. As a result, and except for an occasional lapse, the time she worked has been recorded. There is no reason to guess as to the hours she worked.

17. Her time records and summary produced by Defendants show that she worked very little overtime.

18. Since Ms. Goyne was paid the regular rate for all hours she worked, any additional compensation due to Ms. Goyne will be based on half-time. This requires her salary to be divided by the number of hours worked each week, with that number being multiplied by one-half.

19. Ms. Goyne knew how to record time worked at home, as she admitted she had done so in the past.

20. Propel hired a night manager and a weekend manager to handle issues and calls at night and on weekends. They were hired to handle fleet issues, safety issues, and Comdata requests

outside of regular working hours. They were issued Comdata login codes, a code that the owner of the company, Marc Campbell, did not have.

21. If Ms. Goyne is not an exempt employee, based on the hours she herself recorded, Ms. Goyne would receive $783.91 in overtime pay.

22. Ms. Goyne's testimony as to the amount of unrecorded time she worked was not credible.

23. If Ms. Goyne is found to be due overtime, the amount will be doubled as required by the FLSA.

24. Defendants did not act willfully or in bad faith.

## **Conclusions of Law**

25. This Court has jurisdiction over this lawsuit.

26. Venue properly lies within this Court.

27. Propel qualifies as a covered "employer" as that term is defined by the FLSA and AMWA.

28. Propel is subject to the provisions of the FLSA and AMWA.

29. Ms. Goyne was properly treated and paid as an exempt employee. She fell within the administrative exemption, as the company's very profitability rested on her decisions and independent judgment.

### *Administrative Exemption*

30. In order to be considered exempt under the administrative exemption, an employee must meet the following requirements:

- **Compensation**. The employee must be compensated on a salary basis at a rate of not less than $684 per week. This sum may include bonuses and commissions that are paid annually or more frequently to satisfy up to ten percent of the standard salary level.

- **Duties**. The employee must have a primary duty that includes the performance of office, and nonmanual work directly related to the management or general business operations of the employer or the employer's customers.

- **Discretion**. The employee must have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.

29 U.S.C. § 213(a)(1); 29 CFR § 541.200. Each factor is addressed below.

31. Ms. Goyne met the salary basis requirement to be an exempt employee.

32. Ms. Goyne had as her primary duty the performance of office or nonmanual work directly related to the management or business operations of the company or the company's customers. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, working on a manufacturing or production line or selling a product in a retail or service establishment. 29 CFR § 541.201(a). The Department of Labor has further explained that an exempt administrative employee's primary duty need only relate to the "management" of the employer's business:

> [W]hile management policies are one component of management, there are many other administrative functions that support managing a business…[T]he administrative operations of the business include the work of employees 'servicing' the business, such as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control…[E]xempt administrative work includes not only those who participate in the formulation of management policies or in the operation of the business as a whole, but it 'also includes a wide variety of persons who either carry out major assignments in conduction the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

69 Fed. Reg. 22,138. Ms. Goyne's primary duties related to the management or general business operations of the Company.

33. Nothing in the regulations requires exempt employees to spend more than 50 percent of their time performing exempt work in order to satisfy the primary duty test. 29 C.F.R § 541.700(b). Several courts have found employees to be exempt despite spending less than 50 percent of their time performing exempt duties. *See, e.g., Jones v. Virginia Oil Co.*, 2003 WL

6

21699882, at *4 (4th Cir. 2003) (management found to be the "primary duty" of employee who spent 75 to 80 percent of her time on basic line-worker tasks); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618–20 (8th Cir. 1991) (manager met the "primary duty" test despite spending 65 to 90 percent of his time in non-management duties), cert. denied, 502 U.S. 1073 (1992); *see also* 69 Fed. Reg. 22,186 (declining to adopt a strict 50-percent rule). Indeed, in the right circumstances, an employee's "primary duty" can be as little as 10 percent to 20 percent of the worker's total job duties. The test is not empirical but, rather, involves an individualized balancing of factors.

34. To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment on matters of significance. 29 C.F.R. § § 541.202(a). The exercise of discretion and independent judgment does not have to be customary or regular. Rather, it merely has to be included in the employee's primary duty. 69 Fed. Reg. 22,143 (citing *O'Dell v. Alyeska Pipeline Service Co.*, 856 F.2d 1452 (9th Cir. 1988) and *Dymond v. United States Postal Service*, 670 F.2d 93 (8th Cir. 1982). This means that the employee must exercise "some discretion" but not in connection with each task she performs. *See* 29 § C.F.R. 541.202(a).

35. In general, the Department of Labor's regulations say that the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or deciding after the various possibilities have been considered. 29 C.F.R. § 541.202(a). The terms "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation where the question arises. 29 C.F.R. § 541.202(b). According to 29 C.F.R. § 541.202(b), factors to consider when determining whether an employee exercises discretion and independent judgment on matters of significance include, but are not limited to, whether the employee:

- Has authority to formulate, affect, interpret, or implement management policies or operating practices.

- Carries out major assignments in conducting business operations.

- Performs work that affects business operations to a substantial degree, even if the employee's assignments are related to the operation of a particular segment of the business.

- Has authority to commit the employer in matters that have significant financial impact.

- Has authority to waive or deviate from established policies and procedures without prior approval.

- Has authority to negotiate and bind the company on significant matters.

- Provides consultation or expert advice to management.

- Is involved in planning long or short-term business objectives.

- Investigates and resolves matters of significance on behalf of management.

- Represents the company in handling complaints, arbitrating disputes, or resolving grievances.

36. Although a case specific analysis is required, courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment. 69 Fed. Reg. 22,143 (citing cases).

37. Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed or even reversed at a higher level. 29 C.F.R. § 541.202(c). Further, the fact that many employees may perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.202(d).

38. The exercise of discretion and independent judgment must relate to matters of significance. The term "matters of significance" refers to the level of importance or consequence of the work performed. 29 C.F.R. § 541.202(a). The tasks listed above (29 C.F.R. § 541.202(b)) exemplify matters of significance.

39. Ms. Goyne acknowledged her value to the company. She was a fleet manager, a transportation specialist, Comdata manager, and the safety manager for the company. In these roles, she exercised discretion and independent judgment critical to the success or failure of her employer.

*Executive Exemption*

40. Ms. Goyne fell within the executive exemption at all times, as she managed and supervised employees of the company.

41. To fall under the executive exemption to the FLSA, an employee must generally be responsible for the success or failure of business operations under their management. In addition, management must be the employee's primary duty, the employee must direct the work of two or more employees, and the employee must have the authority to hire or fire other employees or, alternatively, suggest and recommend hiring, firing, advancement, promotion, or other change of status of other employees, which suggestions are given particular weight.

42. Ms. Goyne was an exempt employee pursuant to the executive exemption. Ms. Goyne acted as the supervisor and manager for Propel's truck drivers. Ms. Goyne "customarily and regularly" directed the workload of multiple drivers. She interviewed and selected drivers for hire, directed their work, handled their complaints and grievances, planned their work, determined the types of goods they would transport, controlled the flow and distribution of these goods, provided for the drivers' safety and security, and monitored and implemented legal compliance measures. 29 C.F.R. §541.102.

### *Conclusions of Law as to Damages if Defendants Found Liable*

43. Ms. Goyne was required by the company to keep track of the hours she worked. As her employer, Propel wanted to know what hours were being worked, which is its right, even with exempt employees. 69 Fed. Reg. 22,178 (employers "may require exempt employees to record and track hours"). Ms. Goyne was fully aware of the timekeeping requirement.

44. Ms. Goyne complied with the company's requirement to record her time. She kept her time unless she forgot to clock out. Other than forgetting to clock out, she testified that her time records are accurate. However, she contends she did not keep her time when she worked after hours from home. She offered no credible testimony as to why she did not email her time or note the time worked on her timecards. She was fully aware she should email her time if she worked from home and had done so on multiple occasions.

45. Because Ms. Goyne did not abide by the company's requirement to record her own hours during evening hours, she bears the burden of proof as to the actual time she worked "off the clock." *Joza v. WW JFK LLC*, No. 07-CV-4153(ENV)(JO), 2010 U.S. Dist. LEXIS 94419, at *30 n.8 (E.D.N.Y. Sep. 9, 2010) ("Although the FLSA obligates employers to maintain appropriate overtime records, it is well-established that employers may require employees to follow and adhere to reasonable procedures for reporting overtime worked, and may rely upon what employees report, and do not report."). In *McNight v. Kimberly Clark Corp.*, 149 F.3d 1125 (10th Cir. 1998), an employee's claim for back overtime pay failed when he admitted he had not recorded all the hours he allegedly worked. According to the court, "Such failure to record claimed time is fatal to a later claim for [the time], if the company has no reason to be aware of the overtime." *Id*. at 1130. The evidence will show that Propel hired a night manager and a weekend manager to handle work during off hours. Defendants had no reason to believe, and still do not believe, that Ms. Goyne worked any significant hours while off the clock at night or on weekends.

46. Defendants introduced a summary of the time recorded by Ms. Goyne. Again, Ms. Goyne has testified that other than times she may have forgotten to clock out, her time records are accurate. This summary shows that, based on her own time records, she worked a total of 131.23 overtime hours. Because her salary was paid for all hours worked, whether under 40 or over 40 in a week, any unpaid overtime is calculated at half-time. Thus, if Ms. Goyne was not an exempt employee, she would be entitled to $783.91 of unpaid overtime based on the time records she kept. The Court recognizes that this total is actually a fraction more than the actual unpaid overtime amount, as Defendants divided her salary by 40 hours for each calculation, whereas the correct denominator would be the hours actually worked, which would reduce the amount owed. However, and because the difference would be pennies, Defendants have agreed to use this number for simplicity.

47. Ms. Goyne has not produced any evidence of her damages other than the timecards referenced above. To the contrary, she has simply added 10 unrecorded overtime hours each and every week, with no effort to identify the actual hours worked, much less to offer an explanation as to how she possibly worked the same number of hours each week. This is not sufficient or admissible evidence of damages. Ms. Goyne further inexplicably fails to account for the 49 weeks where she recorded LESS than 40 hours per week. In those weeks, even if she could arbitrarily add an unsupportable 10 more hours of work, the hours must be added to the number of recorded hours and not simply added to "40 hours" as she has done. As an example of her complete failure to so much as attempt to produce credible evidence, Ms. Goyne claims she is entitled to 10 overtime hours in a week where one day was a holiday, one day was a vacation day, and two days were sick days. During this week, she recorded 7.98 hours of work time. But the damage "evidence" she produced seeks 10 hours of overtime for that week.

48. The "evidence" presented by Ms. Goyne as to hours worked is speculative and lacks foundation. Further, she makes no effort to relate the unrecorded hours to the recorded hours or to present any admissible proof as to the amount of overtime worked. When an employer requires its employees to keep time records, it is not sufficient for the employee to simply testify that "I worked X hours of overtime – the same number of hours – each and every week." This "evidence" would allow for overtime to be paid in weeks where Ms. Goyne was on vacation, ill, on holiday, or otherwise absent from work during the week. Ms. Goyne has made no effort to go back through emails, text messages, and phone calls during evenings or weekends to determine the number of calls received, the person who called, and the amount of time spent on the call. This would not have been difficult for Ms. Goyne to accomplish and testified during her deposition that she would do just that. She did not. At the very least, she could have presented a sample of information that would provide the Court with at least some reasonable basis to assess time spent during evenings and weekends. This is particularly important since the company went to the effort and expense of hiring a night manager and a weekend manager. The "evidence" presented by Ms. Goyne is not sufficient to prove damages.

49. Defendants did not act willfully or in bad faith. The two-year statute of limitations applies to this case.

                    Respectfully submitted,

                    FUQUA CAMPBELL, P.A.
                    Riviera Tower
                    3700 Cantrell Road, Suite 205
                    Little Rock, Arkansas 72202
                    (501) 374-0200 – Telephone
                    (501) 975-7153 – Facsimile

By:   /s/ Phil Campbell
       Phil Campbell, AR Bar No. 81028
       pcampbell@fc-lawyers.com
       Chris Stevens, AR Bar No. 2012289
       cstevens@fc-lawyers.com

       COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

     I, Phil Campbell, do hereby certify that I electronically filed the foregoing via the Court's electronic filing system, which shall send notice of such filing to the following individuals this 14th day of August, 2023:

Sean Short
Josh Sanford
sean@sanfordlawfirm.com
josh@sanfordlawfirm.com
SANFORD LAW FIRM, PLLC
Kirkpatrick Plaza
10800 Financial Centre Pkwy, Suite. 510
Little Rock, Arkansas 72211

                    /s/ Phil Campbell